IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-24123-CIV-ALTONAGA

THEODORE KARANTSALIS,

        Plaintiff,

vs.

CITY OF MIAMI SPRINGS, FLORIDA,

        Defendant.

_____/

### PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT AND SANCTIONS

The Plaintiff, THEODORE KARANTSALIS (hereinafter "Plaintiff"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 37(b)(2) and 60(b)(3), 28 U.S.C. §1927, and this Court's inherent authority, hereby moves for relief from this Court's Judgment entered on September 27, 2022, and additionally moves for sanctions. In support thereof, Plaintiff states as follows:

### INTRODUCTION AND FACTUAL BACKGROUND

Immediately following the remand from the Eleventh Circuit, the City of Miami Springs' (hereinafter "the City" or "Defendant") mantra was that it had already corrected its violations, as stated in Plaintiff's complaint, and as such, Plaintiff's action is moot.  Plaintiff issued discovery and diligently followed up and ensured that the discovery was obtained.  However, throughout the case, up to the day before trial, Defendant attempted to remedy the architectural barriers to access cited in Plaintiff's complaint.  After modifications were done, each cured barrier was discovered by Plaintiff, who lives in the neighborhood.  Accordingly, after each physical discovery, Plaintiff demanded supplemental disclosures and such disclosures were produced, or so Defendant led Plaintiff to believe.  Shortly before trial, Defendant remedied the non-compliant sidewalk program.

Plaintiff requested a discovery status hearing before Magistrate Judge Damian, where counsel for Defendant attested that there were **no** other documents relating to discovery requests or the barriers named in the complaint. By the time the parties reached trial, two more barriers were remediated, and the only matters remaining to be addressed were inadequate public parking spaces and whether a policy would be implemented regarding maintaining the path of travel in the gym.

However, Plaintiff could not have demanded what he did not know or see, and until post-trial, on December 7, 2022, Plaintiff did not know that for at least the past year, plans were discussed, studies were performed, and proposals were considered to redesign the Westward Drive Corridor to City Hall—including removing an entire lane of traffic and adding diagonal parking. These discoveries demonstrated that (1) parking was woefully insufficient in the Central Business District, (2) that Defendant had complete authority to alter the road, (3) that many of the representations made by the city manager, William Alonso, the Rule 30(b)(6) corporate representative of the city, were false, and (4) that contrary to counsel's representations before Magistrate Judge Damian, requested discovery was not produced. Had Defendant produced proper and complete discovery regarding the Westward Drive Corridor, Plaintiff would have conducted further discovery and changed arguments at summary judgment and trial, the expert report would have changed, and the remedy demanded relating to this barrier would have been different.

## I.     Facts relating to discovery:

Soon after the remand of this matter, counsel for Defendant, Chris Stearns, made a public statement to the media - "All of the alleged barriers in the complaint have long been remedied." DE 46. To determine what was remaining, Plaintiff propounded requests for production and interrogatories relating to Defendant's assertions that his action was rendered moot. (Exhibit 1, [DE 45-1]). The request for production solicited any documentation relating to the pedestrian right of way and on-street parking for Westward Drive; the request included many different

permutations in its language so there could be no question about the subject matter of the requests. Furthermore, the request was not limited to completed works, but all steps in preparation for any works, including efforts, minutes, agendas, studies, plans, and reports.   The interrogatories requested a full description (again in many permutations) of any of the proposed, pending, or completed modifications. After Defendant moved for an enlargement of time, Magistrate Judge Damian provided until January 27, 2022, to respond to the discovery requests. DE 53.

Defendant's initial disclosures, submitted on January 19, 2022, did not contain, or list, any responsive documents relating to curing of barriers.  *See* Exhibit 2. On January 27th, Defendant responded to the discovery requests and disclosed that the only architectural modification that was completed, pending, or proposed, related to the two parking spaces by the tennis courts. *See* composite Exhibit 3. The only objection to the production request and the interrogatories was the breadth and that the scope of the production would be limited to the relevant locations in the complaint.

Thereafter, disclosures were made <u>after</u> Plaintiff discovered new modifications in his day-to-day activities in the city in which he resides:

- On February 24, 2022, the undersigned advised counsel for Defendant regarding the continuous obligation to update discovery upon discovering that Defendant remediated the tennis court parking after Plaintiff found the slope to be unlawfully steep.  *See* Exhibit 4.

- On March 25, 2022, Plaintiff noticed that there was a new accessible parking space being built at public works. Exhibit 5. The undersigned once again requested updated discovery from counsel. On March 28, 2022, Defendant responded by producing two invoices regarding the repouring of the asphalt for the tennis courts and the new parking space.

Exhibit 6. In May of 2022, Defendant produced emails from February 2022 regarding the city's responsibility for the parking space in front of public works. *See* Exhibit 7.

- On May 10th, Plaintiff noticed a new sidewalk being constructed in front of his house. Again, the undersigned requested the discovery for the new sidewalk and any new updates to discovery. *See* Exhibit 8. A new supplemental response to the production request was received on May 16th and included proposals for ADA modifications dated March 2022. *See* Exhibit 9. After the modification was completed, the undersigned advised Defendant that the slope was unlawfully steep.

- On August 11th, Plaintiff received a notice on his door that further repairs were going to be done to modify the non-compliant curb cut on the new sidewalk by his home. Again, the undersigned advised counsel to update discovery. *See* Exhibit 10. Additional documents were produced on August 15th. *See* Exhibit 11.

While these constant demands to supplement discovery were being requested by the undersigned, the depositions of William Alonso, City Manager, *see* Exhibit 12, and Tammy Romero, Assistant City Manager, *see* Exhibit 13 were being taken in March 2022. The following are excerpts from William Alonso's deposition:

**Page 8:23 to 9:23**
Q With regards to redoing a road or relining a road, do you know if the City has any formula to determine how many accessible on-street parking spaces there should be?
A That, I would defer to the Public Works director.
Q After you received this e-mail, did you do any investigation?
A Investigation? No.
Q Did you ask any people why there -- whether or not you can add a few more disabled parking spaces along Westward Avenue -- I mean Westward Drive, Curtiss Parkway and the Circle?
A I discussed it with the Public Works director.
Q And what did the Public Works director tell you?

A Well, our feeling was that, as I responded to Theo, that it would -- it's not feasible to provide disabled parking spaces on Westward being the fact that we already have disabled parking spaces on the side streets.

**Page 12:15 to 13:7**
BY MR. DIETZ:
Q Why wouldn't a parallel parking spot be permitted on Westward Drive?
A As I mentioned in my e-mail, the size requirements and the layout of Westward Drive would not permit it.
Q What about the size requirements and the layout of Westward Drive would not permit it?
A Like I said, the size requirements. It would entail having to take up one of the driving lanes on Westward Drive in order to have enough room to do it.
Q So the depth of the space is too large to put on Westward Drive?
A Is what now?
Q The depth from the street to the sidewalk is too large to put on Westward Drive?
A Yes.

**Page 17:16 to 17:23**
Q Did you ever ask anybody in Public Works whether or not you can place an accessible spot in front of the city hall, in front of the police station or in front of the post office?
A Like I said before, I spoke to my Public Works director because all of the areas you're referencing are on Westward Drive, and we already discussed what the issues are on Westward Drive.

**Page 18:12 to 19:16**
Q Now, the issue on October 1st, he said that the one on Park Street by the fire station is too far away for him to walk. Was there any thought of doing -- any other way in which to ensure that there were accessible spaces on Westward Drive?
A Again, we already discussed what the issues are on Westward Drive. And in this particular case he's talking about the post office, which is owned by the U.S. government. It's located in a strip mall on that street, and we don't have any control over those spaces.
Q Now, did you see what Coral Gables did on Miracle Mile with regards to taking away the curb?
MS. GIBSON: Objection. Form.
You can answer if you know.
THE WITNESS: I'm aware of what they did on Miracle Mile, yes.
BY MR. DIETZ:
Q Was that ever considered to create more accessible parking on Westward Drive?
MS. GIBSON: Objection. Form.
You may answer.
THE WITNESS: I can answer?
MS. GIBSON: Yes.

THE WITNESS: No, we never considered it. We're not Coral Gables and we're not Miracle Mile. Miracle Mile is nowhere similar to Westward Drive.

**Page 28:21 to 29:12**
Q Okay. With regards to this allegation -- this is B on page 8 of the complaint. Who did you speak with or assign with regards to the insufficient and inadequate public disabled parking spaces; specifically, in front of the police station, substation, city hall and post office?
A As I said before, as far as the police station, city hall, that I myself can see that we do have available handicapped spaces in those areas. As far as the post office and the Westward Drive areas, as I mentioned before, I got with my Public Works director, and that's the issue that I mentioned before about Westward Drive being not feasible to have that in front of every business.

**Page 36:21- 36:24**
Q Are there any additional plans to put in accessible parking by the downtown areas, the police station, city hall or the post office?
A No.

Tammy Romero made the following statements in her deposition:

**Page 27:13-25**
Q. Can you, please, explain to me how parallel parking is provided in front of public works but cannot be provided on Westward?
MS. GIBSON: Objection; form.
A. So, in order to provide the space in front of public works, we had to cut into the sidewalk, the curb, and we had to redesign that area. If we were to do that along Westward Drive, it would be detrimental to the residents, number one, to walk out into the oncoming traffic on Westward Drive. And if we were to do it safely, then we would have to remove one lane of traffic in order to provide the appropriate handicapped space.

**Page 29:2-5**
Q. Did the issue of providing accessible parking spaces ever come before the city commission?
MS. GIBSON: Objection; form.
A. To my knowledge, no.

**Page 29: 19-23**
Q. Is there a plan to provide any more accessible parking spaces in Downtown City of Miami Springs?
MS. GIBSON: Objection; form.
A. To my knowledge, no.

In his Declaration from May 12th, *see* Exhibit 14, Alonso gave the following statement as to Defendant's ability to accommodate accessible parking spaces:

> 42. The on-street parking spaces are too narrow to accommodate accessible parking spaces. In order to build accessible parking spaces on each side of Westward Avenue *[sic]*, the City would have to remove two lanes of traffic. Westward Drive is the main road in the City and has the heaviest flow of traffic. Removing two lanes would be detrimental to the citizens and an unreasonably costly burden on the City.

He also made the following statements about N. Royal Poinciana Blvd., without any mention of Westward Drive:

> 45. The Public Works Department is located at 345 N. Royal Poinciana Blvd in Miami Springs. The County owns and maintains the N. Royal Poinciana Blvd.

> 46. The City provides employee only parking spaces on the Public Works Department premises.

> 47. Even though the City was not required to, on February 22, 2022, I spoke with Miami-Dade Department of Transportation and Public Works ("County") regarding an accessible parking space. The County provided guidance on how to construct a parking space and allowed the City to construct the accessible parking space on their roadway. Exhibit "P."

As the trial date drew near, and as more items were remediated, Plaintiff was concerned about possible surprises.  Therefore, on August 15, 2022, the undersigned requested an update on the interrogatories previously propounded to include any new information about what has been, and will be, done by Defendant.  *See* Exhibit 15. The first trial setting was less than two weeks away, so the undersigned moved for a status conference.  *See* DE 85.  On August 18th, Magistrate Judge Damian held a hearing on the discovery responses where Defendant stated to the court that all documents had been produced and there was nothing else responsive to Plaintiff's requests.  *See* DE 91. The following day, pursuant to this Court's order, Defendant updated its interrogatory response, including discovery solely regarding the sidewalk remediated at Plaintiff's home and other similar sidewalk constructions, some dating back to 2008.  Exhibit 16.

More remediations occurred up to the day before trial. At 12:30 P.M., on September 25th (the day before trial), the undersigned was advised that the parking space in the city hall parking lot was remediated. Exhibit 17. The previous day, September 24th, Plaintiff went to the fitness center and saw that the gym door was tied back; unsure with what it was tied back. On September 25th (1:35 P.M.), counsel for Defendant stated that there was door stopper installed. Exhibit 18.

Again, Defendant made the following assertions in its trial brief [DE 110]:

> (c) Federal Post Office is not a City owned, maintained or operated facility. However, the City has a parking facility behind the building with an accessible parking space, and the building owners have a parking lot with an accessible parking space. There are also safe accessible parking spaces provided on the side road of Westward Drive and Park Ave. Removal of the sidewalk is not feasible and the removal of a lane of traffic on a major road would be to the detriment of the residents of Miami Springs. (p4)

> (d) Community Police Station: The City provides safe accessible parking spaces on the side road of Westward Drive and Park Ave. Removal of the sidewalk is not feasible and the removal of a lane of traffic on a major road would be to the detriment of the residents of Miami Springs. (p4)

In its proposed statement of law and facts [DE 81], which was, in most part, adopted by the court, Defendant asserted the following:

> P: 4 - ¶ 17. The on-street parking spaces are too narrow to accommodate accessible parking spaces. In order to build accessible parking spaces on each side of Westward Avenue *[sic]*, the City would have to remove two lanes of traffic. This is not a readily achievable project and will detrimentally affect the residents. Westward Drive is the main road in the City and has the heaviest flow of traffic. Removing two lanes would be detrimental to the citizens and an unreasonably costly burden on the City. As such, the City has placed accessible parking spaces along the cross-roads of Westward Drive. Westward Drive is the main road in the City and has the heaviest flow of traffic. Removing two lanes would be detrimental to the citizens and an unreasonably costly burden on the City.

> ¶ 18. The accessible parking spaces provided by the City are located in a safe location on the side streets of Westward Drive closest to the accessible entrance. The City provides sufficient accessible parking spaces for the Westward Drive area.

> P:13 - The Court finds that the City has sufficient accessible parking spaces in compliance with the ADA. These accessible parking spaces are located on the

8

shortest path to the accessible route. Moreover, Plaintiff's request for on-street parking directly on Westward drive is not a readily achievable alteration . . . .

## II.     Facts Relating to Evidence Withheld

Unbeknownst to Plaintiff, beginning in Fall 2021, and continuing throughout the litigation timeline described above, proposals for major renovation of the Central Business District (CBD) were in the works. This undisclosed evidence has only now come to light because Plaintiff noticed a discussion of plans to develop the Westward Drive corridor in the agenda packet for the then-upcoming December 12, 2022, City Council meeting. The following events, now unearthed, occurred while the City continued to litigate under the guise that nothing could, or would, be done about the lack of accessible parking on Westward Drive.

On June 14, 2021, the City established the Business and Economic Development Task Force (hereinafter "BEDTF"). *See* Exhibit 19. The BEDTF was formed to meet monthly from September 2021 through September 2022 in order to develop recommendations for City Council on matters related to the business and economic interests of the City. Its meetings were open to the public. Each meeting was required to maintain minutes—however, only some of these meeting minutes have been made available on the City's government website.

As Plaintiff has recently discovered, two significant events occurred when the BEDTF met on December 2, 2021.  *See* Exhibit 20. First, Board Member Max Milam presented a study he had performed that revealed the overwhelming deficiency in the availability of parking in the CBD. *See* composite Exhibit 21. Milam made the following comments during his presentation, *see* Exhibit 22-A:

> 58:40–59:40 — *At our second task force meeting I asked the city if they could provide an analysis with respect to all the businesses in the CBD showing me three things, the amount of on-premises parking that each of those businesses have, . . . the amount of parking that would be required if that business met code, [and] the amount of off-premises public parking spaces in the CBD . . . and why did I want*

*to know this? Because I have been hearing forever we've got enough parking, we've got enough parking. I wanted to see objectively if the city had adequate parking because I keep hearing it.*

*59:42–1:00:54 — City manager Alonso and city planner Hyde stated that the city does have adequate parking for the current businesses . . . I wish you could just show me their analysis of how they determine adequate parking exists for current businesses without just making a statement to that effect. . . . I finally determined that if I wanted to see this, I would have to do it myself, so that's what I did, to make it clear, I should not have to have done this, and that's my next exhibit, that's this big spreadsheet.*

*1:01:51 — CBD is short 850 parking spaces.*

*1:02:51–1:03:08 — I am stating that the CBD is grossly underserved in parking, that's a fact. The CBD lacks the needed parking for businesses to succeed, that's a fact. I'm saying that any suggestion about the city that parking is adequate for CBD is simply a false statement and I hope no representative of the city ever says that again.*

*1:03:45–1:05:56 — No excess or surplus parking spaces were even present before the city approved the town center project, yet the city's assumption for that is that they told the traffic engineer that they could use 47 spaces. The City assumed that we had spaces to give away. We don't.*

*1:23:30–1:24:19 — When it comes to the CBD and the direction of this task force, the lack of public parking in close proximity to the respective businesses needs to be at the top of our recommendation list for survival. This problem requires immediate attention from the city's leadership. You don't have a year to figure this out. That project's coming and it's close and is already bad and it's about to get a lot worse. In closing, I'd like for the information tonight that I'm presenting to be included and attached to the minutes and . . . and I'd also like the minutes to reflect that board member Milam made an extensive presentation about the inadequacy of the public parking in the CBD and that he challenges this task force to take immediate action and make recommendations to the city for creating additional public parking that is centrally located in those impacted businesses.*

*1:26:00–1:26:23 — I would recommend that the city immediately start to look into a pilot program to see if they can turn Westward Drive, at least the first two blocks, into one lane each way and whether it's the inside lane or the outside lane and make that angle parking and that's something that they should start to evaluate and consider immediately.*

The second significant occurrence at the BEDTF's December meeting was that another Board

Member, Nihal Perera, made a proposal for refurbishment on Westward Drive, including the

implementation of diagonal parking; architectural designs were even presented to the task force. *See* composite Exhibit 21; Exhibit 22-A, at 1:32:35–1:48:00.

The BEDTF's January 6, 2022, meeting minutes revealed that the City applied for a Transportation Planning Organization (TPO) grant for a master parking plan in the downtown area. *See* Exhibit 23. At their February 3rd meeting, a mock-up parking resolution was distributed and a vote was taken on whether to recommend that City Council improve the first two blocks of Westward Drive, from the Circle to Park Street, adding public on-street parking and widening the sidewalk. *See* Exhibit 24; Exhibit 22-B, at 1:25:25, 1:25:47–1:26:20, & 1:38:24.  The motion was unanimously passed. *See* Exhibit 24; Exhibit 22-B, at 1:42:44. The board members requested that their recommendation be placed on City Council's next meeting agenda. *See* Exhibit 22-B, at 1:40:35.

The February 14th City Council Meeting agenda included an item on reducing both sides of Westward Drive to one lane in each direction, extending sidewalks, and redesigning the median to include angled parking. *See* Exhibit 25. However, it was revealed that City Council chose to wait on action until a comprehensive parking study was completed, a choice that was reiterated at their next meeting two weeks after that, when they agreed to wait until they received the BEDTF's final recommendations.  *See also* Exhibit 26. The BEDTF's final recommendations were due to the City Council by September 30, 2022, per its establishing document. *See* Exhibit 19.

At the BEDTF's March 3rd meeting, *see* Exhibit 27; Exhibit 22-C, 6:00, Councilman Bob Best acknowledged the Task Force's concerns, encouraged them to continue working on their report to City Council, and mentioned the parking study that was taking place. City Manager Alonso clarified that a grant had been requested for the parking studies. While the May 5th BEDTF meeting minutes are not available on the City's website, the meeting agenda indicates that

"Discussion on improving and increasing parking in the CBD" was part of the new business for that meeting. *See* Exhibit 28.

Then, this past Monday, December 12th, City Council met again. Included in the agenda packet for this meeting was an attachment entitled "Business & Economic Development Task Force Final Report 2022," which included a list of the top five recommendations made by the BEDTF throughout the preceding year for City Council to consider. *See* Exhibit 29, at 15–22. Two of these recommendations pertained to the parking problems in the CBD. One recommendation was that "THE CITY COUNCIL[,] IN A TIMELY MANNER[,] [] TAKE STEPS TO MAKE IMPROVEMENTS TO THE FIRST TWO BLOCKS OF WESTWARD DRIVE FROM THE CIRCLE TO PARK STREET PROVIDING FOR ADDITIONAL PUBLIC ON-STREET PARKING AND SIDEWALK WIDENING, and the other was that "THE CITY COUNCIL []TAKE ACTIONS [to] BOTH IMPROVE AND INCREASE PARKING WITHIN THE CBD." At the close of the BEDTF's report, City Council acknowledged that it was now their job to review the report in detail individually, and to potentially put together workshops on the topics to continue moving towards solutions. *See* Exhibit 22-D, 41:00 – 46:00.

Nothing about the BEDTF, its meetings, discussions, or proposals, was produced after each of Plaintiff's repeated renewed requests for updated discovery. None of the meeting agendas or minutes discussing the proposed changes to the parking in the CBD were produced by Defendant, and nothing about the studies being performed were addressed in any of Defendant's responses to Plaintiff's interrogatories, thereby leaving Plaintiff entirely impotent to participate in any of the discussions open to the public, which should have been available to him as an interested resident of the City.

## <u>ARGUMENT</u>

**I.   THE STANDARD FOR RELIEF BASED UPON FRAUD UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(3)**

Federal Rule of Civil Procedure 60(b)(3) states that on motion and just terms, the Court may relieve a party or its legal representative from a final judgment, order, or proceeding for fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party. To obtain such relief, the moving party must prove by clear and convincing evidence that (1) the adverse party obtained the verdict through fraud, misrepresentation, or other misconduct and (2) the misconduct prevented the moving party from fully and fairly presenting his or her case. *Waddell v. Hendry County Sheriff's Office,* 329 F.3d 1300, 1309 (11th Cir. 2003); *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000).  Such "[m]isconduct may be shown by evidence that the opposing party withheld information called for by discovery or willfully committed perjury." *Kissinger-Campbell v. Harrell*, No. 8:08-cv-568, 2009 WL 10670803, at *1 (M.D. Fla. Dec. 16, 2009).

Proof that the result of the case would have been different but for the fraud or misconduct is not required; instead, Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir. 1978); *see also Wilson v. Thompson,* 638 F.2d 801, 804 (5th Cir.1981) ("We recognize that a party moving under Rule 60(b)(3) may prevail without showing that the alleged fraud affected the outcome of the prior trial."). "[A] litigant who has engaged in misconduct is not entitled to 'the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent.'" *Rozier*, 573 F.2d at 1346.

**a. Defendant Failed to Comply with this Court's Discovery Order and Withheld Evidence of Plans to Redesign the Westward Drive Corridor to City Hall.**

Despite being required to supplement any discovery responses and Plaintiff's repeated renewals of discovery requests from January 2022 through trial in September, Defendant willingly withheld information pertaining to the plans by the City to redesign the Westward Drive Corridor to City Hall, which began as far back as December 2021. Therefore, while Defendant was actively litigating the barriers to parking issues present on Westward Drive, it was simultaneously taking affirmative actions to redesign the parking situation at issue and choosing not to disclose such plans to Plaintiff and this Court. Rule 60(b)(3) applies to misconduct in withholding information called for "by any fair reading" of the discovery order. *Rozier,* 573 F.2d at 1339. Plaintiff's interrogatories and production requests sought, using multiple permutations of the question, any information or documentation relating to the pedestrian right of way and on-street parking for Westward Drive. These discovery requests referred to not only completed works, but all steps taken in preparation for any proposed or pending projects, including but not limited to efforts, minutes, agendas, studies, plans, and reports.  There can be no question that the creation of the BEDTF, and all its discussions, plans, and proposals to remedy the parking situation on Westward Drive, should not have been withheld in the course of a year by Defendant.

Here, misrepresentation persists in each instance where Defendant's counsel repeatedly told this Court that all responses to Plaintiff's requests for discovery were complete and that there was nothing further. As is clearly evidenced by the timeline of events, this was not the case—everything about the BEDTF and its work was withheld, and therefore, Defendant's counsels misrepresented the facts each time they insisted that all relevant information and discovery had been disclosed.

"Rule 60(b)(3) does not require that the information withheld be of such nature as to alter the result of the case." *Hirsch v. Nova S.E. Univ., Inc.*, 289 Fed. Appx. 364, 368 (11th Cir. 2008) (internal citations omitted). "Although alteration of the result is not the touchstone of a Rule 60(b)(3) analysis, the moving party surely is obligated to demonstrate the relevance of the withheld evidence." *Id.*; *cf. Rozier*, 573 F.2d at 1345 ("It is apparent ... that the [withheld evidence] ... might have been the catalyst for an entirely different approach to the case on a theory that the plaintiff, lacking the document, let die before it reached the jury."). Had Defendant not withheld information sought by Plaintiff's interrogatories and production requests, the undersigned's entire case strategy would have changed; depositions of members of the BEDTF actively seeking to provide more parking would have been taken, questions of adequacy of parking, safety issues, feasibility of removing sidewalk and a lane of traffic would have been answered, studies or proposed plans in the task force's final report would have been examined, Plaintiff's questions in other depositions would have had a different focus, the task force's meeting minutes and agenda could have been the basis to seek additional discovery, and both parties' experts' views on the parking issue would have shifted. As such, by Defendant withholding significant documents and relevant information of the City's plans to redesign Westward Drive, it prevented Plaintiff from "fully and fairly" presenting his case. *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc. (JJVC)*, 818 F.3d 1320, 1324 – 25 (Fed. Cir. 2016) (finding that the verdict was "irretrievably tainted by . . . false testimony . . . and withholding of relevant documents"). While Rule 60(b)(3) does not require that the information withheld be of such nature as to alter the result of the case, the relief that could have been granted by this Court would have differed had Defendant disclosed proposals and the forthcoming modification of the CBD—as the only relief that could be provided is to ensure compliance with the new construction requirements set forth in 28 CFR § 35.151.

Defendant's failure to disclose an entire task force and its studies, discussions, and proposals (as well as the vocal outrage from the community prompting these actions) is anything but mere carelessness. *Compare Attea v. Univ. of Miami*, 678 F. App'x 971, 974 (11th Cir. 2017) ("Evidence of an opposing party's carelessness is insufficient to justify relief."), *with Rozier*, at 1341 (finding that relief under Rule 60(b)(3) was warranted where the defendant intentionally withheld a trend cost estimate that was responsive to the plaintiff's interrogatories and relevant to the plaintiff's claims and that the obligation to disclose prior to trial even though the defendant claimed that he did not know about the document until after the discovery responses were filed), *and Suite 225, Inc. v. Lantana Ins. Ltd.*, 625 F. App'x 502, 506 (11th Cir. 2015) (finding that the insurance company prevailed in its Rule 60(b)(3) motion where the insured constantly withheld and misrepresented evidence of financial trouble which "may have exposed a possible motive [for the wrongdoing] and resulted in further investigation").

Perjury also constitutes fraud for purposes of Rule 60(b)(3). *Rembrandt Vision Techs., L.P.*, 818 F.3d at 1325. The moving party must still provide clear and convincing evidence of false testimony. *Id.* To meet this burden, the challenged testimony typically must contradict either undisputed documentary evidence or the witness's own testimony in another case. *Id.* at 1323 (showing expert witness's perjury were so one-sided that parties did not dispute the falsity of his testimony); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1385 (11th Cir. 1988) (referring to letters from universities that stated that witness who claimed to be their student was not); *Trantham v. Socoper, Inc.*, 1:16-CV-1476-KOB, 2022 WL 902730, at *13 (N.D. Ala. Mar. 28, 2022).

To make matters worse, Defendant perjured itself when its representative and City Manager, William Alonso, affirmed that "the depth from the street to the sidewalk is too large to put on

Westward Drive" during his March deposition, as he had been recorded making statements about studies to change precisely that area at the March 3rd BEDTF meeting. Defendant's counsel even asserted in its trial brief that "removal of the sidewalk is not feasible and the removal of a lane of traffic on a major road would be to the detriment of the residents of Miami Springs." Such are two examples—had the BEDTF and its plans not been withheld during discovery, Plaintiff's counsel could have changed all parts of his trial strategy and impeached Alonso.

## II.   STANDARD FOR IMPOSING SANCTIONS FOR FAILURE TO DISCLOSE DISCOVERY

Plaintiff seeks sanctions under Fed. R. Civ. P. 37. Sanctions under this rule are predicated upon a party's failure to disclose information that should have been disclosed pursuant to Fed. R. Civ. P. 26(a) or 26(e)(1) or failure to amend a prior response to discovery as required by Fed. R. Civ. P. 26(e)(2).  Rule 37(c)(1) allows a court to impose monetary sanctions for failures to disclose or supplement prior disclosures. *Hirsch*, 289 Fed. Appx. at 368. As evidenced by one renewed request after another, Defendant failed to supplement its disclosures with *any* information about the BEDTF and the task force's extensive discussions, studies, plans, and proposals for the parking situation on Westward Drive.

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and [i]nsure the integrity of the discovery process." *Id.* (citing *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir.1999)). Further, findings of such violations post-trial do not absolve the wrongdoer of their discovery violations. *Rozier*, 573 F.2d at 1337–40; *Action Marine, Inc. v. Cont'l Carbon, Inc.,* 243 F.R.D. 670, 684 (M.D. Ala. 2007). Defendant's failure to produce discovery disclosing the existence of the BEDTF, and its plans for Westward Drive parking, undoubtedly prejudiced Plaintiff, as he was excluded from partaking in the planning process that directly affected him as a resident of the City of Miami Springs seeking usable accessible parking downtown. Defendant's

failure to disclose the BEDTF's plan to Plaintiff prevented two groups with a common purpose from sharing information and working together for the betterment of the City.

Plaintiff also seeks sanctions against Defendant and their counsel under 28 U.S.C. § 1927. Separate and apart from Plaintiff's request for fees and costs against Defendant, Plaintiff additionally seeks an award of fees and costs against Defendant's counsel for their unreasonable and vexatious multiplication of these proceedings.[1] To that end, 28 U.S.C. § 1927 provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

There are three requirements for an award under Section 1927: "(1) unreasonable and vexatious conduct; (2) that conduct must multiply the proceedings; and (3) the amount of the sanction must bear a 'financial nexus to the excess proceedings.'" *Cook-Benjamin v. MHM Corr. Servs., Inc.*, 571 F. App'x 944, 948 (11th Cir. 2014) (quoting *Peterson v. BMI Refractorie*s, 124 F.3d 1386, 1396 (11th Cir. 1997)). A Section 1927 award is appropriate "where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstructs the litigation of nonfrivolous claims." *Brandt v. Magnificent Quality Florals Corp.*, No. 07-20129-CIV-HUCK, 2009 WL 899925, at *3 (S.D. Fla. Mar. 31, 2009) (citations omitted), *aff'd*, 371 F. App'x 994 (11th Cir. 2010). Sanctions "are measured against objective standards of conduct" and, thus, are appropriate "even if the attorney does not act knowingly and malevolently." *Id.*

---

[1] In addition to the statutory bases set forth above, the Court also may invoke its inherent power "to award a reasonable attorneys' fee to the prevailing party when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Pedraza v. United Guar. Corp.*, 313 F.3d 1323, 1336 (11th Cir. 2002). As set forth above, such a finding is appropriate here.

In the case at bar, Defendant litigated remaining modifications that were being completed up to the day before trial and disclosed same only when notified by Plaintiff that he personally saw the modifications. Notwithstanding the change in the legal relationship of the parties after the appeal was taken, Defendant deliberately withheld evidence throughout the course of the litigation regarding the task force and its plans, and litigated the Westward Drive parking situation that if disclosed, it could have resulted in a settlement and not multiply the proceedings. To add insult to injury, Defendant's counsel presented his clients' incomplete and false testimony regarding availability of sufficient parking, the ability of what they can do with regards to parking, and the proposals for doing what was said that they would not do—remove one lane of traffic in each direction on Westward Drive.

Under these circumstances, it cannot be disputed that Defendant and counsel unreasonably and vexatiously multiplied these proceedings. As a result, sanctions under Section 1927 are necessary and appropriate. *See* e.g., *Norelus v. Denny's, In*c., 628 F.3d 1270, 1302 (11th Cir. 2010) ("The district court did not abuse its discretion by finding that the Amlongs' creation and submission of the errata document and their continued pursuit of Norelus' claims amounted to 'objectively reckless conduct' that multiplied the proceedings in this case 'unreasonably and vexatiously.'"); *Attea v. Univ. of Miami*, No. 12-23933-CIV, 2015 WL 5921790, at *6 (S.D. Fla. Apr. 15, 2015) (awarding Section 1927 sanctions against plaintiffs' counsel in ADA/Rehab Act case, where counsel "needlessly obstructed the litigation of Defendants' non-frivolous motions for summary judgment and thereafter knowingly and recklessly pursued frivolous objections and motions to set aside the granting of the motions"), R&R adopted, 2015 WL 13376922 (S.D. Fla. May 13, 2015); C*ook-Benjamin v. MHM Corr. Servs., Inc.*, 571 F. App'x 944, 949 (11th Cir. 2014) (affirming sanctions under § 1927 where counsel refused to drop frivolous claims "until the

response to the defendants' summary judgment motion," as that decision "unnecessarily and unreasonably multiplied the litigation"); *Claiborne v. Wisdom,* 414 F.3d 715, 722 (7th Cir. 2005) (affirming § 1927 sanctions against counsel who "engaged in evasive and dilatory tactics"). A similar finding is appropriate here.

## III.    REMEDIES

Plaintiff seeks an equitable remedy to cure the harm that occurred.  The harm is that Plaintiff was never made aware of the true circumstances of the wholesale modifications proposed in the Downtown Business District. Had Plaintiff known about BEDTF's future plans at these meetings, he would have attended same and participated in the creation of a plan. Pursuant to Title II of the Americans with Disabilities Act, new construction is required to be fully compliant with the Americans with Disabilities Act. 28 C.F.R. 35.151.  Plaintiff should be provided any documents regarding new construction of the central Downtown Business District, advised of meetings of any city committee related to the new construction of the central business district, and be able to ensure that all new construction complies with the Americans with Disabilities Act.  To the extent that the new construction does not comply with the Americans with Disabilities Act, this Court should reserve jurisdiction to permit Plaintiff to bring any dispute he has with regards to compliance with the ADA until six months after construction is completed.

As to fees, Plaintiff continues to assert that it is a prevailing party and entitled to fees as a result of the appeal and legal change in the parties' relationship as a result of such, and even more so after Plaintiff is provided affirmative relief from this Order.  However, pursuant to 28 U.S.C. § 1927, all fees post-appeal should be the joint responsibility of Defendant and its counsel for the continuous misrepresentation that this matter was moot, and the discovery practices to hinder Plaintiff's right to discovery throughout this case.

## CONCLUSION

WHEREFORE, Plaintiff, THEODORE KARANTSALIS, requests that this Honorable Court grant this motion for relief from judgment, and require the defendant to advise Mr. Karantsalis of all actions taken to redesign and construct the Central Business District, and to reserve jurisdiction in the event that there is a dispute regarding ADA compliance with the new construction, his fees and costs for prosecuting this action, and such further relief as this court deems just and equitable.

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that, pursuant to Local Rule 7.1, on the following dates, by the specified means, the undersigned made multiple good faith attempts to confer with opposing counsel but was ignored in all instances.

1. December 9, 2022 – e-mail to opposing counsel, Selena Gibson, at gibson@jambg.com, and Chris Stearns, at Stearns@jamgb.com. There has been no response as of the date and time of this filing.

2. December 12, 2022 – e-mail to opposing counsel, Selena Gibson, at gibson@jambg.com, and Chris Stearns, at Stearns@jamgb.com. There has been no response as of the date and time of this filing.

3. December 13, 2022 – phone call made to opposing counsel, Selena Gibson, at 954-670-2049, with voicemail requesting a return call to discuss Plaintiff's intent to file this motion. Call has not been returned as of the date and time of this filing.

4. December 16, 2022 – phone call made to opposing counsel, Selena Gibson, at 954-670-2049, with voicemail requesting a return call to discuss Plaintiff's intent to file this motion. Call has not been returned as of the date and time of this filing.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 19, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties and counsel of record, or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

By: */s/ Leigh C. Markowitz*
Leigh C. Markowitz, Esq.
Florida Bar No.: 1017900
*Matthew W. Dietz, Esq.*
Florida Bar No.: 0084905
*Talhia S. Rangel, Esq.*
Florida Bar No.: 1018408
Disability Inclusion and Advocacy Law Clinic
Nova Southeastern University,
Shepard Broad College of Law
3305 College Ave., Ft. Lauderdale, FL 33314
Telephone: 954-262-6063
Email:  mdietz@nova.edu
        ts872@nova.edu
        lmarkowi@nova.edu
        cfitzlaf@nova.edu

22