IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-24123-CIV-ALTONAGA

THEODORE KARANTSALIS,

        Plaintiff,

vs.

CITY OF MIAMI SPRINGS, FLORIDA,

        Defendant.
_____/

## PLAINTIFF'S REPLY MOTION FOR RELIEF FROM JUDGEMENT AND SANCTIONS

The Plaintiff, THEODORE KARANTSALIS (hereinafter "Plaintiff"), by and through undersigned counsel, replies to the City of Miami Springs, Florida's (hereinafter "the City") Response to Plaintiff's Motion [DE 130] for Relief from this Court's Judgment [DE 115] entered on September 27, 2022, and Sanctions, and states as follows:

The City's position is that since the City's Task Force only made recommendations (as was their charge), they have "nothing to do with the issues tried before this court" as the recommendation "may or may not occur at some unknown point in the future." [DE 137, p. 13]. As demonstrated below, the City knew and withheld all evidence of downtown parking issues and discussions, including studies and minutes relating to these issues. There is no question that the evidence of the lack of parking and the planning for redevelopment of the entire downtown area would not only have been relevant to the Plaintiff's discovery, but also would have changed the Plaintiff's strategy and demands. This information would have been directly pertinent in determining to resolve this case as it would be futile for this Court to order architectural changes to existing elements when those elements will soon be replaced, regardless of what specific

changes would have been ordered. As such, the best relief that the Plaintiff may receive is to be made a part of the solution in order to ensure that the new or altered construction meets the requisite standard.

**I. The discovery propounded clearly encompasses any contemplated changes or proposals, whether developed by the City, the City's boards, or outside persons and provided to the City.**

**A. Request for Production dated December 14, 2021.**

On December 14, 2021, the Plaintiff requested production from the City [130-1, pg. 2–5], which the City responded to **without objection**—the City's Response to Plaintiff's Motion [DE 137] failed to attach the very specific, well-defined requests for production made by the Plaintiff along with its responses to those requests [DE 137-2]. The Plaintiff's request specifically includes 23 separate requests that requested documents related to the defined "right of way," "on-street parking," and "parking lot." These specific requests included all studies, reports, plans, contracts, grants, grant proposals, agendas, minutes, budget allocations, requests for proposals, invoices, and contracts with third parties, and went as far as requesting all "efforts" relating to any such changes. It did not exclude any items in the City's possession drafted by persons who were not employees of the City. Furthermore, the request for production specifically defined the "Subject Pedestrian Right of Way," and "Subject On-Street Parking,"[1] to narrow the requests to the specified locations in the City[2] As demonstrated in the Plaintiff's Motion, the issue regarding inadequate

---

[1] The "Subject Pedestrian Right of Way" is defined as the Pedestrian Right of Way including the (1) pedestrian sidewalks, (2) pedestrian street crossings, (3) pedestrian access or circulation routes, (4) protruding objects, street furniture, or signs in the path of travel, in the area bounded by Dove Avenue to the North, Northwest 67th Avenue to the West, Westward Drive and North Esplanade Drive to the South, and Route 27 to the East.

[2] "Subject On-Street Parking", includes parking spaces, curb cuts, cross walks, accessible aisles, and accessible paths located on: a. Westward Drive from Circle Park to Esplanade Drive; b. Park Street from Nahkoda Drive to Hibiscus Drive; c. Cross Steet from Nahkoda Drive to Hibiscus Drive; d. North Royal Poinciana Blvd in front of Miami Springs Public Works; e. Northwest 67th Ave. from Starling Ave to NW 38th St.; f. Flamingo Circle

parking and changes to Westward Drive were frequently discussed and debated in both City Council meeting minutes and Task Force meeting minutes.

### B. Interrogatories

Further, at no time were the Plaintiff's interrogatories limited to actions made by the employees of the City, from City departments, or paid for by the City. [DE 130-1, pg. 6–13]. The Task Force was a City-created entity that immediately made recommendations for the same issues involved in the Plaintiff's complaint.

### C. Relevance

The City argues that the Task Force and its members' actions are not attributable to the City. However, the Task Force and its members had knowledge as to issues with the City's parking and as to the veracity of the claims by the City that it had sufficient parking in the downtown area and plans were being considered to alleviate parking problems. The Task Force was comprised of participants in the City, held meetings in the City, and was established by the City to study and provide recommendations to the City. There were even members of the Task Force who, in their personal capacities, and as members of the Task Force, produced their own parking studies. Throughout the trial in this case, the City maintained that it had sufficient parking and that no future work was going to take place regarding parking. Meanwhile, this Task Force, their members, their architects, and other agents had worked hundreds of hours analyzing the parking situation.

Furthermore, to state that these meetings were noticed for the Plaintiff to attend is a total disregard for the responsibility of a party to accurately respond to discovery requests. For instance, the City's council meeting on February 28, 2022 focused almost entirely on the need for

redevelopment of parking and streetscape, and its content should have been included as responsive to the Plaintiff's discovery requests.  *See* https://youtu.be/KwgYpz_I8IQ

    II.    **"The City has not (and likely will not) adopted any of the [recommendations] of the task force"**

William Alonso's Declaration that "The City has not (and likely will not) adopted any of the [recommendations] of the task force" would be a surprise to the City Council of Miami Springs and the Miami-Dade Transportation Planning Organization (TPO). The TPO just awarded $50,000 to complete a master parking plan study, money received under a grant proposal submitted months prior to the trial in this matter. Mr. Alonso's thoughts on the futility of the recommendations of the task force were certainly not a part of the grant proposal.

The Task Force's January 6, 2022 meeting minutes [DE 130-23] revealed that the City applied for a TPO grant from the Miami-Dade Transportation Planning Organization for a master parking plan in the downtown area. On February 17, 2022, the City Council unanimously approved timely improvements to Westward Drive from the Circle to Park Street, including additional public on-street parking and sidewalk widening. [DE 130-29, p. 18(D)].  The agenda for the January 9, 2023, meeting, attached as Exhibit "A," contains a recommendation to award a $70,700 contract to do a formal parking analysis of Miami Springs [Exhibit A, pg. 235].  Witness Tammy Romero sat on the selection team for that grant.  The scope and goals of the study are included within the prevailing bid. [Exhibit A, pages 272 to 276.].  This report includes two past studies done by or on behalf of the City, the Miami Springs Downtown Business District Parking Study and the Langan Traffic & Parking Study from February 27, 2019. [Exhibit A, pg. 272].

Furthermore, in the City's resolution approving the expenditure of $70,700, the City further revealed that [Exhibit A, pg. 279] –

- The City of Miami Springs submitted a transportation planning proposal to the TPO for the Miami Springs Parking Analysis.
- The TPO awarded the City a Program grant in the amount of $50,000.
- On October 24, 2022, "to secure the Program Grant, the City Adopted 2022-4505 approving an Interlocal Agreement with the TPO.

Furthermore, in Resolution 2022-4505 – dated October 24, 2022 [Exhibit A, pg. 299-301], the City of Miami Springs had already applied to the TPO and was granted funds to develop a parking study, contingent on an agreement with the TPO. The contract presented for approval on October 24th contained a required grant document from William Alonso, dated August 29, 2022. [Exhibit A, pg. 317].

At the February 28, 2022 meeting, William Alonso advised the City Commission that he had applied for this grant for the paring study for the downtown area during a two hour City council meeting about the needs for parking and overhaul of the downtown business area.

### III.     Accessible parking spaces

It should be axiomatic that a lack of spaces would also include a lack of accessible parking spaces. Further, any new parking plans should include accessible parking spaces that comply fully with the requirements under the Americans with Disabilities Act.  The fact that disability issues were not taken into account, or even brought up in the disability affairs meeting, demonstrates that there was an essential need for a person to be involved in the planning who did consider the needs of persons with disabilities.

Whether the City decided to follow the recommendations of the Task Force or developed a different plan to overhaul the downtown area, any alterations and new construction require full compliance with the ADA, which would necessarily include accessible parking. The trial was

based on the ADA standard for existing facilities, and not the City's obligation for full compliance for new and altered areas.

**IV.      Standard for the Motion**

Whether or not the City of Miami Springs breaks ground and starts developing a new downtown is not the relevant question. Rule 60(b)(3) does not require the information withheld be of such nature as to alter the result of the case.  The Plaintiff's strategy as to the parking issues in this case would have been different had information not been withheld. Prior to the modification of the sidewalk by the Plaintiff's home soon before trial, and after demand, the Plaintiff received complete copies of modifications done, and the modifications planned, to give him access to the City's sidewalk program.  Depositions were taken of those responsible and the City disclosed information.

As to the parking issues brought up in this case, the City made several statements in support of their summary judgment, attested to by William Alonso, and carried through to trial.  These are as follows:

> 42. The on-street parking spaces are too narrow to accommodate accessible parking spaces. In order to build accessible parking spaces on each side of Westward Avenue, the City would have to remove two lanes of traffic. Westward Drive is the main road in the City and has the heaviest flow of traffic. Removing two lanes would be detrimental to the citizens and an unreasonably costly burden on the City.
>
> 43. As such the City has accessible parking spaces along the cross-roads of Westward Drive. In this area there are a total of 180 parking spaces, this includes 20 employee parking spaces. Of the 160 public parking spaces there are 8 accessible parking spaces.
>
> 52. Prior to Plaintiff's lawsuit, there was no report or complaint made to any City employee or the Disability Advisory Board by Plaintiff or any other individual regarding any of the parking spaces listed in Plaintiff's operative complaint.

Declaration of William Alonso [DE 62-1] (statements were also included within the Statement of Facts in support of Defendant's summary judgment).  These representations were, at best, selective representations with disregard to the other known evidence at the time.  For example, as to 52, above, Mr. Alonso's statement excludes the Task Force by only referencing "report[s]" and "complaint[s]" made by the "Plaintiff" or another "individual," categories that semantically exclude the Task Force; was, the Task Force and its members are not "Plaintiff or any other individual"; as to 42, Mr. Alonso presented his opinion rather than all the information in the City's possession concerning this position; or lastly, as to 43, the area counted was selectively chosen, and had the Plaintiff received the Task Force's information, these statements could have been rebutted.

If the Plaintiff had the required discovery, he would have had knowledge of additional witnesses who would have rebutted the testimony of both Mr. Alonso and the City's expert, and then he would have changed his strategy. The Plaintiff would have been able to: rebut Mr. Alonso's statements with his own comments from board meetings about this subject; get copies of the grant applications and requests for proposals for the parking study and the reasons for the parking study; adequately question Mr. Alonso and staff at the City regarding the Task Force's findings, their experts, and the questions raised by the City council persons in their meetings about the subject; conduct investigations and have the Plaintiff's expert review the work done by others to determine the feasibility of parking; build on the reports completed to do an overlay of the needs of accessible parking. Instead, the City only made selective, beneficial disclosures. The City did not even disclose the modifications they were planning to make until renovations were completed and the Plaintiff made renewed demands.

### V.     How would the new evidence change the outcome of the trial?

In this case, by the time of trial, the Plaintiff readily agreed that most of the relief was not at issue because of the changes that the Defendant had made prior to trial. The sidewalk issue was vehemently disputed and was the main issue in the Plaintiff's case until the City built a sidewalk by his home. The same thing occurred with respect to the parking by the tennis court, the door holder by the gym, the parking by public works, and the redrawn parking space by City Hall.

If the Plaintiff had received the discovery requested, the result would have been dramatically different, and he would not have sought the same relief from this Court. The Plaintiff would have wanted to be a part of the discussion to ensure that his city would be accessible to him. If the study that the City applied for a grant by February 2022 stated that it was infeasible to do parking, the Plaintiff would have the assurances that he needed to ensure that this issue was not similar to the other modifications that were made because of this case. If the Defendant disclosed to the Court the probability of the renovation to the downtown within a fixed time, then this Court would not grant injunctive relief for existing construction when new construction would be more accessible and any order of same would be irrelevant (or at worst, prevent a more accessible construction and be used as an excuse to deny modifications).

If there is a potential that the Plaintiff will receive better access in his neighborhood and be part of the change, as Title II requires community input to ensure accessibility, there is no doubt that he would do so. *See* Am. Council of the Blind of New York, Inc. v. City of New York, 579 F. Supp. 3d 539, 591 (S.D.N.Y. 2021)(quoting 28 C.F.R. 35.150(d)(1)("ADA implementing regulations provide that, where structural changes are undertaken, a public entity 'shall provide an opportunity to interested persons, including individuals with disabilities or organizations

representing individuals with disabilities, to participate in the development of the transition plan by submitting comments.'")

### VI. Ad Hominem Attack

Counsel for Defendant claims that this action was moot immediately after the decision on the appeal was rendered and that this action was maintained only for attorney's fees and costs. While it is true that this case should have been able to have been resolved when the decision on appeal was rendered, the Plaintiff did not receive most of what he demanded until immediately before trial. This case would have resolved quickly had the City agreed to do what it has now done, and if the City had explained to the Plaintiff that it was going through the process of redesigning the downtown business district. The decision was made to render the case moot by the City at the point that the case was remanded, notwithstanding attempts to settle.

Counsel for Defendant's claim that this action was maintained for purposes of attorney's fees is an inappropriate ad hominem attack. For the past 25 years, the undersigned has built a national reputation for bringing cases for persons with disabilities that are in line with Congressional intent under the law. This is to the extent that Senior District Court Judge Paul Huck issued an order which made the undersigned's former organization, Disability Independence Group, the recipient of funds from a sanction, and which required the malefactors to do volunteer work for the undersigned. *See* Johnson v. 27th Ave. Caraf,, 1:18-cv-24472-JEM, 1:18-cv-24586-PCH.  While the undersigned did not usually take Title II architectural removal claims, this was a pro se case that was unfairly dismissed and required representation. Additionally, unlike the City's counsel, the Plaintiff's counsel has received no payment from this case and has not benefited from its expansion over almost four years.

## CONCLUSION

WHEREFORE, the Plaintiff, THEODORE KARANTSALIS, requests that this Honorable Court grant the Motion for Relief from Judgment, require the Defendant to advise the Plaintiff of all actions taken to redesign and construct the Central Business District, to reserve jurisdiction in the event that there is a dispute regarding ADA compliance with the new construction, his fees and costs for prosecuting this action, and such further relief as this court deems just and equitable.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 24, 2023 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties and counsel of record, or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

By: */s/ Talhia S. Rangel*
Talhia S. Rangel, Esq.
Florida Bar No.: 1018408
Leigh C. Markowitz, Esq.
Florida Bar No.: 1017900
Matthew W. Dietz, Esq.
Florida Bar No.: 0084905
Disability Inclusion and Advocacy Law Clinic
Nova Southeastern University,
Shepard Broad College of Law
3305 College Ave., Ft. Lauderdale, FL 33314
Telephone: 954-262-6063
Email: mdietz@nova.edu
ts872@nova.edu
lmarkowi@nova.edu
cfitzlaf@nova.edu